PETER W. LEARY *vs.* THELMA LEARY.

JUNE 22, 1960.

PRESENT: Condon, C. J., Roberts, Paolino, Powers and Frost, JJ.

PAOLINO, J.   This bill in equity was brought by a son against his mother.   The bill prays that she be ordered to convey to him his alleged share in certain real estate as an heir-at-law of his father, Michael T. Leary, who died intestate on April 5, 1937, and that she account to him for his share of the rental income of such real estate and the proceeds from the sale of certain portions of the property disposed of by her.   After a hearing in the superior court on bill, answer and proof, a decree was entered denying and dismissing the bill.   The cause is before us on the complainant's appeal from such decree.

The following facts are not disputed.   At the time of his death Michael T. Leary owned four parcels of real estate in the city of Newport.   He left a widow, respondent herein, two children, John and Frances, both over twenty-one years of age, and two other children, Peter, complainant herein, and Paul, both minors.   The mother was appointed administratrix of her husband's estate and guardian of her minor sons.   The administration of the decedent's estate is not in issue.   The only property involved is the real estate which under the intestate laws of this state descended to his children.

At the time of his father's death complainant was nearly sixteen years of age. On August 30, 1937 the probate court appointed respondent guardian of the person and property of the complainant and the other minor son. The petition for respondent's appointment as complainant's guardian was signed by complainant. Thereafter, on October 18, 1937, for the purpose of better investment, respondent, as guardian, was granted permission by the probate court to sell complainant's interest in the real estate for not less than $5,000 subject to encumbrances and her right of dower. At the time of the father's death the real estate, which was encumbered by mortgages and unpaid taxes, had a total valuation for tax purposes of $46,100.

After obtaining such permission from the probate court the respondent, on January 8, 1938, conveyed complainant's interest in the real estate to her son John and her daughter Frances for an alleged consideration of $5,000. On April 2, 1938 John and Frances, for an alleged consideration of $5,000, transferred the real estate to respondent individually. This deed conveyed to her not only the interest of Peter and Paul which she, as guardian, had previously conveyed to John and Frances, but also the interest of the two older children. She thus acquired full title to all her children's interest in her husband's real estate. Neither of these deeds contained documentary stamps and it appears that no money was actually involved in the conveyances.

In 1941 respondent conveyed certain premises to her son John and his wife, in 1942 certain other premises to her daughter Frances and her husband, and in 1948 certain real estate to her son Paul and his wife. In addition to these transfers she sold some of the real estate to persons outside the family and still holds some of it in her own name.

The complainant lived with his mother until June 16, 1942 when he entered the military service of the United States where he remained until his discharge on October 31, 1945. He attained his twenty-first birthday on July 16,

1942. While he was stationed in Florida and shortly after he reached his majority he received a communication which he was asked to sign and return. This was a guardian's discharge releasing his mother from all claims which he might have against her as guardian. On August 4, 1942 he signed the release in the presence of an officer. The release recited that he had adjusted and settled with his mother her accounts as guardian and that he had received from her all the balance of his estate in her hands. This method of settling a guardian's account is provided for in general laws 1956, §33-17-1, par. 3, subpar. Fourth, and, if otherwise proper, is admittedly lawful. *Probate Court* v. *Higgins,* 58 R. I. 58, 63.

After his discharge from the army in October 1945 complainant returned to his mother's home where he continued to live until March 1946 when he married. Sometime in 1947 he moved to a house owned by his mother where he has continued to live with his wife and children without paying rent.

Although there is no express allegation of fraud in the bill, it does contain allegations which in effect charge respondent with actual fraud in procuring the guardian's discharge and release from complainant. He alleged in the bill that his mother often told him he had no interest in the estate or property of his father; that from the time of his father's death to August 1949 when the instant bill was filed he received no part of his share in his father's estate; that he did not know, and his mother never told him, the value of his share or that he had any interest therein; that he trusted his mother and relied on her representations; and that he was under the impression that all of the real estate left by his father belonged to his mother.

The complainant testified that he signed the guardian's release without reading it and without knowing the full effect of such action. But he did not testify that any misrepresentation had been made by his mother prior to the

time he signed such release. He admitted that his mother helped him financially both before and after he entered the military service; that he lived with her after his discharge from the army without paying for room and board; and that after his marriage he lived in his mother's property without paying rent. He stated that sometime before he signed the instant bill in August 1949 he found out that he was entitled to a one-quarter interest in his father's real estate; that he could not say exactly when he learned of this; and that approximately six months before filing the bill he talked to his mother about his interest and she told him he never had any such interest. He testified that he did not learn that his mother had filed a petition to sell his interest in the real estate until shortly before the instant bill was filed.

The respondent's daughter Frances was called by complainant as a witness and her testimony corroborated that of complainant in some respects. She testified that she found out about her share in 1942; that she got the house she lived in for signing off her share; and that she never found out what her share was. She admitted that she and her mother have not spoken to each other since 1942.

The respondent filed an answer wherein she denied that complainant did not know the effect of his execution of the guardian's discharge and release. She further averred that the release was signed voluntarily by complainant without any misrepresentation or influence having been exerted on him. The answer alleged further that complainant was guilty of laches.

At the hearing respondent testified that the guardian's discharge had been sent to complainant by her attorney, who has since deceased, and that it was returned to him by complainant; that her attorney had told her about the share of the children; that on his advice she got quitclaim deeds from the children in order to obtain title to the real estate in her own name; that the two minor children had

to be taken care of; that she sent complainant money while he was in the service; that she helped him financially after his discharge and marriage; that she paid for his clothing and grocery bills; and that she continued to help him financially until May or June 1949 when she stopped because she had to have money for herself.

She also testified that although he was working during most of said periods of time he did not contribute any money for rent or the maintenance of the property; that she did not have to provide for or support the other children after they were married; that she was on friendly terms with complainant in July 1949; and that the instant bill was filed two or three months after she stopped giving him money.

Two letters sent by complainant to his mother in 1943 are in evidence as respondent's exhibits. The first letter begins with the following sentence: "I am sorry to have to keep asking for money. I got everything that was coming." In the second letter appears the following sentence: "By the way last July when I was in Miami I signed a paper. Didn't it give you complete control over everything I own or had claim to?" Both letters indicate love and affection on the part of complainant towards his mother. The complainant admitted that he wrote to his mother and wired for money while he was in the service, and he has not seriously disputed her testimony relative to the help she gave him financially after his discharge from the army.

The trial justice filed a decision in which, after carefully reviewing the pleadings, he analyzed the evidence before him in great detail and passed on the weight thereof and the credibility of the principal witnesses. He concluded from the evidence pertaining to the various transactions involving the conveyances of the real estate in question that the plan was to get the whole title in the mother's name and that this plan was impliedly agreed upon and acquiesced in by complainant.

The trial justice characterized complainant as a young man of more than average intelligence. He expressly stated that he seriously lacked the veracity one would expect from a person seeking equity to right an alleged wrong. Furthermore he did not give credibility to complainant's testimony that he did not know what he was doing when he signed the petition for guardianship in 1937 or the release in 1942. Neither did he believe his testimony that he did not know and had never been told what his share was in the real estate. In reaching this conclusion the trial justice relied on the statements in the two letters in evidence and on the clear language of the release, as well as on the fact that it was executed in the presence of an army officer.

He also referred to complainant's testimony relating to his appearance as a witness for his mother in 1947 at the hearing on respondent's first and final account as administratrix of her husband's estate, which accounting was opposed by his sister Frances. In addition he reviewed the evidence concerning the money, food, clothing and shelter which complainant had received from his mother for several years. The trial justice believed respondent's testimony with reference to the foregoing and concluded that complainant had received his share through the moneys advanced to him and his continued support by his mother. The trial justice also found that respondent did not violate her duties as guardian nor benefit from her position as such; that the release was knowingly and willingly signed and executed by complainant; and that he confirmed the release by his letter to respondent.

The trial justice also found as a fact that at all times since he signed the petition for guardianship complainant knew of his interest in his father's estate and that he approved and acquiesced in the actions of his mother until the parties had a falling out; that the credibility of complainant was such that there was much left to be desired;

and that he had failed to meet his burden of proof. A decree embodying such findings was thereafter entered.

The complainant has filed thirty-seven reasons of appeal. Under those which he has briefed and argued he contends in substance that the decree is against the law, the evidence and the weight thereof; that the trial justice has misconceived the evidence and the legal effect thereof; that respondent has been guilty of fraud; that the trial justice erred in finding that complainant had not sustained his burden of proof; and that he erred in ruling that the release in question constitutes a bar to relief for complainant.

A careful examination of the record leads to the inescapable conclusion that the determination of the controversy between these parties depends almost entirely upon the question of credibility. The trial justice, who saw and heard the parties, seriously questioned complainant's veracity relative to his testimony pertaining to the signing of the petition for guardianship in 1937 and his execution of the guardian's release in 1942 after he had attained his majority. He likewise gave no weight or credibility to complainant's testimony that he did not learn of his interest in the real estate in question until 1949. In reaching his conclusion on these particular issues the trial justice relied largely on the testimony of complainant's presence in the probate court in 1947 at the hearing on the first and final account of his mother as administratrix of his father's estate and also on the contents of the two letters which are in evidence.

It is clear that he believed respondent and placed great weight on her testimony, especially that relating to the money, food, clothing, and shelter which complainant had received from her up to May or June 1949. On the basis of such testimony he concluded that her actions with relation to the real estate were part of a plan acquiesced in by complainant and approved by him when he attained the legal capacity to do so after his twenty-first birthday at which

time, as the trial justice found, he knowingly and voluntarily executed the release in question.

In considering the instant appeal, the question for our determination is whether the decree was warranted by the evidence, and not whether the reason for the decree given by the trial justice was good or bad. *Tormey* v. *Cassidy*, 69 R. I. 302, 307. It is also well settled that where the evidence is conflicting, and especially where the credibility of the witnesses means so much, the trial justice, who sees and hears them testify, has a great advantage in determining where the weight of the credible evidence lies, and his decision will not be disturbed by this court unless it is clearly wrong or he has overlooked or misconceived material evidence. *Tormey* v. *Cassidy, supra; Arbolino* v. *Arbolino*, 89 R. I. 307, 152 A.2d 541.

After carefully examining the record we cannot say that he was clearly wrong or that he has overlooked or misconceived material evidence. There is no merit in complainant's contention that the decision was against the weight of the evidence. In our opinion the decision of the trial justice is supported by the evidence and does substantial justice between the parties. There is nothing to indicate that the decree denying and dismissing the bill was based on the question of laches. Moreover, we are convinced that, even though the trial justice discussed such issue in his decision, he did not base his decision or the decree on that issue. Therefore we do not deem it necessary to treat the contentions with reference thereto.

We have examined the authorities and cases cited by the complainant, especially those dealing with the duties of a guardian to a ward. In view of our above conclusions it is unnecessary to discuss the same since they do not apply in the circumstances of this case.

The complainant's appeal is denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court for further proceedings.

FROST, J., dissenting. After a consideration of the evidence in this case I am unable to agree with the majority opinion.

On the death of her husband, who died intestate, the respondent found herself in a critical position. His personal property appears to have been insignificant in amount. At the time of his death he owned in fee simple four parcels of real estate in the city of Newport, title to which had been taken solely in his name.

The chairman of the board of tax assessors of the city testified that in his opinion the market value of the four parcels was $74,500. There were, however, mortgages and unpaid taxes. This real estate descended to the four children, subject to the widow's right of dower. The respondent was appointed administratrix of her husband's estate and also guardian of her two minor children, Peter, complainant herein, and Paul. The complainant will hereinafter be referred to as Peter. As guardian she at once sought permission from the probate court to sell Peter's interest in the real estate for not less than $5,000. The reason given was for change of investment. She sold his interest for an alleged $5,000 to her children John and Frances, each of whom was of age. Three months later John and Frances conveyed to their mother for an alleged $5,000 the interest just conveyed to them and also their own interests. There was no change of investment but there was a change of title. Thereafter the interest which had descended to Peter was in his mother in her individual capacity.

In 25 Am. Jur., Guardian And Ward, §210, p. 131, it is stated, "It is a rule of universal recognition that a guardian, in purchasing or otherwise acquiring the property of his ward, violates the duty imposed by the fiduciary character of his position. Such a transaction, whether made directly by the guardian or through another, is voidable at the suit of any proper party in interest."

In 39 C.J.S. Guardian And Ward §93, p. 164, it is stated, "Since the guardian cannot purchase his ward's property for his own benefit or profit, if he purchases the property of his ward directly or indirectly, the ward may have the sale set aside without a showing of actual fraud or injury." See also *United States* v. *Dunn,* 268 U. S. 121; *Hearn* v. *Hearn,* 24 R. I. 328; *Pelletier* v. *Phoenix Mutual Life Ins. Co.,* 49 R. I. 135.

Peter entered the air service while a minor. He became twenty-one years of age on July 16, 1942, at which time he was in Florida. Nineteen days after attaining his majority he received by mail a communication which he was asked to sign and return. This was a release of all claims which he might have against his mother as guardian. She never filed an account in the probate court as guardian of Peter, but instead obtained a release from her ward, a method allowed by G. L. 1956, §33-17-1. Notwithstanding that Peter had received neither real estate nor money, nor any part of his inheritance, he signed and returned the release. His signature was witnessed by a commissioned officer. The release recited that he had adjusted and settled with the guardian her accounts of said guardianship and had received from her all the balance of his estate in her hands. Testifying at the hearing Peter stated that he received no money from his mother prior to signing the discharge or release; that from his father's death to August 1949, when the present bill was filed, he received no money whatever from his share in his father's estate; and that his mother never told him the value of his share. There was testimony that Peter trusted his mother implicitly.

After the instant bill was filed, respondent filed an answer through her counsel wherein she incorporated two defenses, namely, a release and laches. The release upon its face is a perfect defense. The complainant is not free from criticism for signing a paper of the import of a release without any consideration of it simply upon request of his

mother. Peter trusted his mother and he also testified at the hearing that he was under the impression that all of the real estate left by his father belonged to her. However, the fact that the son is not free from criticism does not absolve respondent from her responsibility in seeking a release knowing, as I believe the evidence shows, that her ward was ignorant of his rights in the matter of the real estate. Peter testified that his mother never informed him that he was entitled to a one-quarter undivided interest in his father's estate.

Peter's sister testified that on more than one occasion her mother asserted that upon the father's death all of the real estate became hers (respondent's) and that the children had nothing.

In my judgment the respondent's conduct as guardian of Peter, and particularly her action in obtaining the release from him with full knowledge of her son's ignorance of his rights in the real estate, was so fraudulent as to vitiate the release. *Hearn* v. *Hearn, supra; Pelletier* v. *Phoenix Mutual Life Ins. Co., supra.*

In 2 Scott, Trusts (2d ed.), §216, p. 1588, the author states, "* * * where the trustee purchases for himself trust property * * * the transaction will be set aside not only if the trustee fails to disclose all relevant facts but also where the transaction is not in all respects fair to the beneficiary." And at 2 id. §217, p. 1601, it is stated, "If the trustee commits a breach of trust without the consent of the beneficiary previously given, he may nevertheless be relieved of liability if the beneficiary subsequently discharges him * * * by a release. * * * The discharge is effective only if the beneficiary had knowledge of all relevant facts that the trustee knew or should have known and of his legal rights and the discharge was not induced by improper conduct on the part of the trustee."

In my judgment the complainant was not guilty of laches since the instant suit was filed less than four years after

he was discharged from service on October 31, 1945.

I would sustain the appeal and remand the cause to the superior court for an accounting either by the court or by a master in chancery as may be determined.

ROBERTS, J., concurs in the dissenting opinion of Mr. Justice Frost.

*Maurice L. Dannin, Gabriel D. Russo, James S. O'Brien, William C. Waring, Jr.,* for complainant.

*Paul F. Murray,* for respondent.